# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

ANGELETHA DE'BRUCE SLAUGHTER,   :
                                   :
          **Plaintiff,**           :
                                   :
**v.**                                  :        **5:06-CV-143 (CAR)**
                                   :
                                   :
**DOOLY COUNTY ET AL.,**          :
                                   :
          **Defendants.**        :
_____ :

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Angeletha De'Bruce Slaughter, proceeding *pro se*,[1] filed the present

lawsuit alleging various claims against the Defendants stemming from her three-day

incarceration at the Dooly County Justice Center in Pinehurst, Georgia. Plaintiff brings

claims under 42 U.S.C. § 1983 for violations of her Fourteenth Amendment rights to be

free from excessive force, inadequate conditions of confinement, and inadequate

medical care; violations of the Americans with Disability Act, 42 U.S.C. § 12131 et seq.

("ADA"); and state law claims for false imprisonment, battery, and intentional infliction

of emotional distress. All Defendants filed motions for summary judgment which are

currently pending before this Court: Defendant Dooly County's Motion for Summary

---

[1] Plaintiff filed her Complaint, proceeded through discovery, and responded to Defendant's
Motion for Summary Judgment *pro se*. Almost six months after the expiration of discovery and four
months after the deadline for dispositive motions, on July 3, 2007, attorney Chevene King entered
his notice of attorney appearance on behalf of Plaintiff.

Judgment [Doc. 14]; Defendants Craig Peavy, Shenice Gates, and Jerome Anderson's Motion for Summary Judgment [Doc. 19]; and Defendants Van T. Peavy[2] and Frank Jasso's Motion for Summary Judgment [Doc. 29]. Also pending before this Court are Defendants' Motion to Strike [Doc. 36] the documents submitted by Plaintiff in her response to Defendants' Motions for Summary Judgment; Defendants' Motion to Quash a Subpoena [Doc. 49] served upon defense counsel by Plaintiff; and Plaintiff's Motion to Reopen the Discovery Period and to Extend Time in which to Conduct Discovery and to Prepare and Respond to Dispositive Motions [Doc. 51]. Having read and considered the motions, the record in this case, the applicable law, and the arguments of the parties, the Court hereby **GRANTS** Defendants' Motions for Summary Judgment [Docs 14, 19, and 29], **DENIES as moot** Defendants' Motion to Strike [Doc 36] and Motion to Quash Subpoena [Doc 49], and **DENIES** Plaintiff's Motion to Reopen the Discovery Period and to Extend Time in which to Conduct Discovery and to Prepare and Respond to Dispositive Motions [Doc. 51].

## BACKGROUND

This case arises out of Plaintiff's incarceration/detention at the Dooly County Justice Center ("Jail") and her placement in the restraint chair. Because this case is before the Court on summary judgment, the Court must view the facts in the light most favorable to Plaintiff, the non-moving party, and draw all favorable inferences in favor of Plaintiff. Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 918, 918-19 (11th Cir.

---

[2] Defendant Sheriff Van Peavy has no relation to Defendant Craig Peavy.

1993). However, the only evidence Plaintiff has submitted in support of her claims are the unsworn statements she made in her Complaint and in her Response to [Defendants'] Separate and Concise Statement of Material Facts as to Which There is No Genuine Issue to Be Tried. Plaintiff has submitted no additional evidence, other than certain medical records and disability applications. The Court has before it no deposition, affidavits, or other sworn statements made by Plaintiff.

On the evening of June 2, 2004, Plaintiff was arrested by the City of Unadilla Police Department and transported to the Jail where she was detained for three days until her release on June 4, 2004. Upon arrival at the Jail, she informed officials that she suffered from various medical conditions, including "Dyshydrotic Eczema (a chronic skin condition located on the sole of each foot)," "Post-Traumatic Stress Disorder," "severe menopausal distress, as well as other mental illnesses that can make her more prone to suicidal [sic]." (Compl. ¶¶ 38-44.) Plaintiff also told officials that she was undergoing psychiatric treatment provided through the Dublin Veterans' Administration Medical Center, where she received medications and counseling. (Compl. ¶¶ 45, 46.) Based on this information, Plaintiff, on the first morning of her incarceration, at 9:00 a.m. on June 3, 2004, was taken to registered nurse Pat Watson for medical evaluation. (Second Aff. of Melanie Watson, Ex. A.)

Plaintiff alleges that she was not evaluated for her medical ailments, medications, or medical history. Plaintiff states that when she entered the medical unit, she stood against the wall while Nurse Watson talked on the telephone. Despite her

attempts, Plaintiff was unable to inform Nurse Watson about her medical conditions because the nurse remained on the telephone, telling Plaintiff to "shut the hell up and sit [her] ass down until I am off the phone." (Compl. ¶ 50.) Plaintiff responded by informing Nurse Watson that her clothing was "soaking wet" from night sweats caused by her menopausal conditions, and she did not want to sit in wet clothing. (Pl's Resp. to Separate and Concise Statement of Material Facts, Doc. 25.) A male jailer in the room then demanded Plaintiff sit down, and when Plaintiff told him that she did not wish to sit in wet clothing, he walked over, picked her up off of her feet, and physically slammed her down on the medical examining table. (Id.) When Nurse Watson ended her telephone conversation, she asked Plaintiff about the medications Plaintiff was taking, but Plaintiff would not respond to the nurse's questions. Nurse Watson then instructed jailers to remove Plaintiff and take her to the isolation unit. (Id.) Thereafter, jailers came and took Plaintiff to "the lockdown holding cell as instructed for five days no visitors, no phone calls." (Compl. ¶ 51.)

After being placed in isolation, Plaintiff alleges that jail officials came to her cell with the restraint chair and "made her sit in it, with ankles and wrists bound to the chair, from 8:00 a.m. to 6:00 p.m., without so much as a bathroom break." (Compl. ¶ 54.) While strapped down to the restraint chair, Plaintiff alleges she "was never checked on therefore forcing her to use the chair [as] her bathroom." (Compl. ¶ 55.) Finally, Plaintiff states that she failed to receive any medical treatment while she was incarcerated.

Defendants' evidence, on the other hand, paints a different picture of events

during Plaintiff's three-day incarceration. Defendants submitted two separate prison logs which document actions taken with respect to Plaintiff during her incarceration at the Jail. The first is referred to as a "daily log," and the second is entitled "Record of Inspections of Inmate Assigned to Administrative Segregation" ("inspection records"). These records, together with Defendants' affidavits, reveal the following facts.

When Plaintiff was brought to the medical unit on the first morning of her incarceration, Nurse Watson took Plaintiff's medical history, which included gathering the names of the medications Plaintiff was taking. (Second Aff. of Melanie Watson, Ex. A.) As part of her evaluation, officials completed the following documentation: an "Inmate Health Questionnaire," which describes the medications Plaintiff reported she was taking for her medical conditions, and treatments she was undergoing; a medical form entitled "Problem List"; an "Intake Checklist," including "Screening Orientation of Medical Services"; a "General Consent Form for Treatment"; and a "Suicide Prevention Screening Form." (Id.)

During the evaluation, Nurse Watson documented that Plaintiff complained about the temperature in her room and became "argumentative, uncooperative, and abusive to the jail staff and nurse." (Id.) Because "she would not follow instructions or provide information, Plaintiff was placed in iso-seg. (isolation - segregation) for cooling/calming down time." (Id.) The daily log shows that Plaintiff was placed in the isolation unit from 9:25 a.m. to 11:50 a.m. The log reveals that at 9:25 a.m. on June 3, "Slaughter, Angel is locked down in iso #128 no visitation, no phone calls till further notice per Nurse Watson." (Dwain Peavey Aff., Ex. A.) The inspection records also

document that at 9:20, "Inspecting Officer" S. Black placed Ms. Slaughter in isolation "per nurse." (Id.) Thirty-five minutes later, at 10:00 a.m. Plaintiff was "pulled for Nurse Pat." (Id.) At 10:20, Defendant Frank Jasso made an entry in the inspection records indicating that Plaintiff "appear[ed] awake," and at 11:50, Defendant Jasso noted that Plaintiff "refus[ed] [a] sandwich." (Id.)

Because Plaintiff began continuously beating on her cell door with her hands and feet, jail officials placed Plaintiff in the restraint chair to protect her from self-harm. (Dwain Peavey Aff., Ex. A.) Despite Plaintiff's contention that she was placed continuously in the restraint chair from 8:00 a.m. to 6:00 p.m., prison records show that Plaintiff was first placed in the restraint chair at 12:35 p.m., and then released for a short period of time two hours later at 14:30. (Id.) However, because Plaintiff told officials she would continue to beat on her cell door, and, in fact, again began beating on her cell door with her feet and hands, she was placed back in the restraint chair fifteen minutes later, at 14:45. (Id.)

Plaintiff remained in the restraint chair from 14:45 until 18:00.[3] At 16:20, Lt. Dwain Peavey, who is not a defendant in this case, checked on Plaintiff and offered her a drink of water and a bathroom break, which Plaintiff refused. (Id.) Approximately one hour later, Lt. Peavey stated that when he "attempted to release Slaughter from the

---

[3] The exact time Plaintiff was finally released from the restraint chair is unknown. Plaintiff, however, states in her Complaint that she was released at 6:00 p.m. or 18:00. The inspection records indicate that Officer "K. West" began monitoring Plaintiff at 20:15, and that Plaintiff "appears to be asleep." According to the Affidavit of Dwain Peavey, jail officials do not make notations concerning whether an inmate placed in the restraint chair is asleep or awake; thus, the records demonstrate that Plaintiff was no longer in the restraint chair as of 20:15 or 8:15 p.m.

restraint chair, she told me if I released her that she would continue to beat on her cell door. I left her in the restraint chair for her own safety and protection." (Id.) All evidence indicates that Plaintiff was finally released from the chair three hours and fifteen minutes later, at 18:00, and placed back in the isolation unit. At 10:00 a.m. on June 4, Plaintiff was released from her isolation cell and from custody at the Jail.

On December 22, 2000, Sheriff Van Peavy adopted a Use of Restraint Chair Policy. The policy has, since that time, been in force and effect in substantially the same form. The policy was most recently re-approved on August 30, 2005. The policy is, and was, to use a restraint chair to "restrain and limit the involvement of inmates/detainees who exhibit such violent behavior that they become a danger to themselves or to others." (Van Peavy Aff., Ex. C.) The policy was created based upon the United States Department of Justice Immigration and Naturalization Service Detention Standards. (Id.) The policy expressly states that the restraint chair "shall NOT be used for punishment." (Id., emphasis in original.) The policy provides for the provision of food and frequent bathroom visits, and provides for the continued monitoring and the involvement of jail supervisors. (Id.)

## STANDARD OF REVIEW

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a

properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Ultimately, summary judgment must be entered where

"the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex, 477 U.S. at 323.

## DISCUSSION

A.    Motion to Strike, Motion to Reopen Discovery, and Motion to Quash Subpoena

    1.    *Motion to Strike*

Together with her response to Defendants' Motions for Summary Judgment, Plaintiff submitted various medical records and applications for disability benefits ostensibly to support her claims. Defendants have moved to strike these records. The Court is unclear why Plaintiff submitted these records and what purpose these records serve to support her claims. Regardless, the Court need not, and does not, consider these records in its evaluation of Plaintiff's claims; thus, Defendants' Motion is denied as moot.

    2.    *Motion to Reopen Discovery and Motion to Quash Subpoena*

Almost six months after the expiration of discovery and four months after the deadline for dispositive motions, on July 3, 2007, counsel for Plaintiff entered his appearance in this case. Over one month later, counsel filed the instant motion requesting that this Court reopen the discovery period, and extend the time in which to conduct discovery and to prepare and respond to Defendants' Motions for Summary Judgment. Plaintiff's request is denied.

Prior to the expiration of discovery in this case, this Court held a scheduling hearing, where both Plaintiff and defense counsel were present. During the hearing, the

Court went to great lengths advising Plaintiff of her right to conduct discovery and describing the types of discovery available to Plaintiff. Moreover, this Court informed Plaintiff that it was in her best interest to obtain an attorney and that it would grant an extension of time for Plaintiff to seek the services of an attorney and to conduct discovery. (Transcript of scheduling hearing, pp. 7-8.) After such hearing, Plaintiff requested, and the Court granted, thirty days additional time to conduct discovery. (Docket text entry dated Dec. 27, 2006.) By January 10, 2007, all Defendants had filed their motions for summary judgment, to which Plaintiff responded. Not until July 3, 2007, did counsel entered his appearance on behalf of Plaintiff, and he now moves pursuant to Federal Rule of Civil Procedure 6(b) to reopen discovery and to allow additional time to file motions.

Under Rule 6(b), the Court in its discretion may allow an act to be done after the expiration of a specified period "for cause shown" and "where the failure to act was the result of excusable neglect." Fed. R. Civ. P. 6(b). Plaintiff has failed to show either. Plaintiff's *pro se* status does not permit her to disregard deadlines – especially in light of this Court's direct advice to her during the scheduling hearing – or somehow render her unable to properly respond to Defendants' motions. Furthermore, granting Plaintiff's Motion at this time would be unfairly prejudicial to Defendants who would be required to expend additional resources conducting discovery Plaintiff had ample opportunity to conduct months ago. Thus, Plaintiff's motion is denied.

Having denied Plaintiff's Motion to Reopen Discovery, the Court denies Defendant's Motion to Quash Subpoena as moot.

The Court now turns to the merits of Plaintiff's claims and Defendants' Motions for Summary Judgment.

B.    <u>Defendant Dooly County</u>

Liberally construing the Complaint, as this Court must,[4] Plaintiff contends that Dooly County is liable under (1) § 1983 for violation of her Fourteenth Amendment rights to be free from excessive force, inadequate conditions of confinement, and inadequate medical care; (2) Georgia State law for false imprisonment, battery, and intentional infliction of emotional distress; and (3) the ADA for failing to accommodate her disability.  For the reasons discussed below, all such claims fail, and Defendant Dooly County is entitled to judgment as a matter of law.

1.    *§ 1983 Claims*

a.    *Excessive Force and Conditions of Confinement*

(i)    *Direct Liability*

Plaintiff contends that Dooly County is directly liable for the deprivation of her constitutional rights to be free from excessive force and inadequate conditions of confinement arising out of her placement in the restraint chair, under the theory that the county is responsible "for the training, policies, practices, and customs of its Jails, Correctional Institutions, and Detention Centers, as well as for the hiring, training,

---

[4] The Court must construe Plaintiff's *pro se* Complaint more liberally than it would formal pleadings drafted by trained lawyers.  <u>See</u> <u>Tannenbaum v. United States,</u> 148 F.3d 1262, 1263 (11th Cir. 1998) ("*Pro se* pleadings are held to a less stringent standard than pleading drafted by attorneys and will, therefore, be liberally construed."); <u>Powell v. Lennon</u>, 914 F.2d 1459, 1463 (11th Cir. 1990) ("In the case of a *pro se* action, . . . the court should construe the complaint more liberally than it would formal pleadings drafted by lawyers.").

supervision, control and discipline of its Sheriff, Deputy Sheriffs, Jailors, and Jail Personnel." (Compl. ¶ 6.) However, because Plaintiff's claims involve functions for which the state, not the county, are responsible, these claims fail.

Local government bodies such as counties are persons within the meaning of section 1983 and can be held accountable for the deprivations of federally protected rights. See Monell v. Dep't of Soc. Serv., 436 U.S. 658, 689 (1978). However, a county "is liable under section 1983 only for acts for which the county is actually responsible." Grech v. Clayton County, 335 F.3d 1326, 1329 (11th Cir. 2003) (citing Marsh v. Butler County, 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc)). Liability does not rest on a theory of respondeat superior. Id. (citations omitted). Instead, local governments are directly liable under section 1983 for constitutional deprivations resulting from "(1) an unconstitutional action taken pursuant to an officially promulgated policy statement, decision, regulation, or ordinance; or (2) governmental custom, even though not authorized by written law." Martinez v. City of Opa-Locka, 971 F.2d 708, 713 (11th Cir. 1992) (citing Monell, 436 U.S. at 690-91). Therefore, to attribute liability to a county under section 1983, a plaintiff must demonstrate that county's official policy caused a constitutional violation. Grech, 335 F.3d at 1329.

A plaintiff has two methods by which to establish a county's policy: "identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." Id. (citations omitted). Under either prong, a plaintiff "(1) must show that the local governmental entity, here the county, has authority and responsibility over the

governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." Id. (citations omitted).

Here, Plaintiff contends the deprivation of her constitutional rights arising from her placement in the restraint chair was caused by the Jail's official Restraint Chair Policy. However, Dooly County neither adopted nor was permitted to adopt or implement policies concerning use of force or the restraint chair. Dooly County is constitutionally and legally prohibited from performing these law enforcement functions that are specifically delineated by Georgia law as duties of the sheriff. "In contrast to the State, counties have no authority or control over, and no role in, Georgia sheriffs' law enforcement function. Counties do not grant sheriffs their law enforcement powers, and neither prescribe nor control their law enforcement duties and policies." Grech, 335 F.3d at 1336 (citing O.C.G.A. § 15-16-23, and Wayne County v. Herrin, 210 Ga. App. 747, 751 (Ga. Ct. App. 1993)); see also Manders v. Lee, 338 F.3d 1304, 1311 (11th Cir. 2003) ("under Georgia's Constitution, the State has exclusive authority and control over the duties and affairs of the sheriff's office."). Georgia sheriffs, when acting in the areas of law enforcement, duties in the courts, and corrections, are "state actors," not "county actors." Id. at 1312-1319.

Plaintiff also contends Dooly County violated her constitutional rights by failing to provide training and supervision to jail officials. Inadequate police training by a county can rise to the level of a "policy or custom" that is actionable under section 1983

where the failure to train amounts to a "deliberate indifference" to the rights of the plaintiff.  City of Canton v. Harris, 489 U.S. 378, 388 (1989).  However, Dooly County cannot be held responsible for any failure to train claim under § 1983.  "Counties have no role in the training or supervision of the sheriff's deputies.  Instead, sheriffs exercise authority over deputies independent from the county.  Sheriffs alone hire and fire their deputies."  Id. at 1336 (citations omitted); see also Manders v. Lee, 338 F.3d 1304, 1311 (11th Cir. 2003) ("under Georgia's Constitution, the State has exclusive authority and control over the duties and affairs of the sheriff's office"; and sheriff's deputies "are employees of the sheriff and not the county.").  Because Plaintiff's claims against Dooly County involve the corrections/detentions function of the office of the sheriff, which are state, not county, functions, Plaintiff's § 1983 direct liability claims against Dooly County fail.

(ii)     *Vicarious Liability*

Plaintiff's contentions that Dooly County is vicariously liable for the wrongful acts of jail officials which deprived her of her constitutional rights also fails.  As explained above, neither the Sheriff nor any deputies or employees of the jail were county employees.  Thus, there can be no vicarious liability imposed on the county.  Furthermore, even if these persons had been county employees, any claims against Dooly County that are predicated upon vicarious liability must fail.  "A county's liability under § 1983 may not be based on the doctrine of *respondeat superior*."  Grech, 335 F.3d at 1329 (citing City of Canton, 489 U.S. at 385; Monell, 436 U.S. at 694); see also, e.g., Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998); Buckner v.

Toro, 116 F.3d 450, 452 (11th Cir. 1997).

        b.     *Deprivation of Medical Treatment*

Plaintiff's claims that the County is liable for Plaintiff's inadequate medical treatment during her incarceration must also fail.  The provision of medical treatment to inmates and detainees is a function of the sheriffs, not counties.  "It shall be the duty of the sheriff . . . [t]o take from the outgoing sheriff custody of the jail and bodies of such persons as are confined therein and to furnish inmates 'medical aid, heat, and blankets, to be reimbursed if necessary from the county treasury.'" Manders, 338 F.3d at 1315. Because the sheriff's "authority and duty to administer the jail in his jurisdiction flows from the State, not [the] County," the County cannot be liable for Plaintiff's claim that she was provided inadequate medical treatment.  Id.

        2.     *Georgia Law Claims*

Plaintiff also claims that Dooly County is vicariously liable for the tortious actions of Sheriff Peavy or his deputies also fail as a matter of law.  "Georgia courts . . . speak with unanimity in concluding that a defendant county cannot be held liable for the tortious actions of the sheriff or his deputies in performing their law enforcement duties." Grech, 335 F.3d at 1336 (citing O.C.G.A. § 15-16-23; Wayne County v. Herrin, 210 Ga. App. 747, 751 (Ga. Ct. App. 1993)).

        3.     *ADA Claims*

Plaintiff also claims that Dooly County is liable under the provisions of Title II of the ADA.  Plaintiff claims that she was a "qualified individual with a disability, within the meaning" of the ADA "to the extent that [s]he suffered from mental illness

requiring that [s]he receive both treatment and medication in order to maintain [her] mental stability." (Compl. ¶ 80.) Plaintiff claims Dooly County "[f]ailed to make reasonable medications in policies, practices, or procedures," "[f]ailed to take such steps as were necessary to ensure that Plaintiff . . . was not excluded, denied services," failed to make accommodations, and used excessive force. (Compl. ¶ 81.) What accommodations Defendants failed to make or what accommodations would have been required under the ADA are unclear. Regardless, it is clear that all of Plaintiff's allegations deal with the corrections/detention functions of the sheriff, which concern state, not county, functions.

Even assuming that Plaintiff was a "qualified individual" under the ADA to have standing to pursue her ADA claim, and that Plaintiff was, in fact, denied appropriate treatment, Dooly County cannot be liable under an ADA claim. As shown above, the conduct alleged to give rise to Plaintiff's ADA claim – failure to provide medical treatment and accommodations – concern state, not county, functions. In carrying out these functions, the sheriff acts as an official of the State, not the County. Thus, Dooly County is not the proper "public entity" which bears responsibility for the conduct alleged to have violated the ADA. See 42 U.S.C. § 1213(1).

C.      Defendants Craig Peavy, Shenice Gates, & Jerome Anderson

Plaintiff has also named Craig Peavy, Shenice Gates, and Jerome Anderson as Defendants in this case. Any claims against these Defendants, however, must fail due to the fact that none of them were policy makers at the Jail and none had any interaction with Plaintiff during her brief incarceration in June 2004.

16

Defendant Craig Peavy has never been a jailer at the Dooly County Jail. (C. Peavy Aff. ¶ 4.) He is a employed by the Dooly County Sheriff, but his job duties include overseeing the daily operations of the Sheriff's Department's Patrol Division. (Id. at ¶ 3.) Major Peavy has never possessed nor exercised policy-making power concerning the operation of the Jail and was not involved in the development or implementation of the use of force, restraint chair, or other policies related to the operation of the Jail. (Id. at ¶ 4.) Furthermore, he was in no way involved in any of the incidents alleged by Plaintiff involving the placement of her in the restraint chair or otherwise. (Id. at ¶ 5.) In fact, Major Peavy had no involvement whatsoever in any matter involving the detention of Plaintiff at the Jail. (Id.)

While both Defendants Jerome Anderson and Shenice Gates were jailers at the Jail, neither possessed any policy-making powers concerning the operation of the jail; were not involved in the development or implementation of the use of force, restraint chair, or other policies related to the operation of the Jail; and neither had any involvement in any manner with Plaintiff during her detention. (Anderson Aff. ¶¶ 3-5, Gates Aff. ¶¶ 3-5.) Thus, any claims against these three Defendants necessarily fail.

D.    Defendants Frank Jasso & Sheriff Van Peavy

    1.    *Defendant Frank Jasso*

Plaintiff asserts also claims against Defendant Frank Jasso, who was a jailer at the Jail during the time Plaintiff was detained. Plaintiff's claims against Jasso, however, must also fail because he was not involved in the decision to place Plaintiff in the restraint chair or in Plaintiff's actual placement in the chair. (Jasso Aff. ¶ 6.) Nor was

he involved with or in any way responsible for monitoring her after her placement in the chair. (Id.)  Furthermore, Defendant Jasso neither had nor exercised any authority to make policies for the Jail or regarding treatment of inmates or detainees at the Jail.  (Id. at ¶ 11.)

Defendant Jasso's involvement with Plaintiff while at the Jail was very limited. His first encounter with Plaintiff occurred around 10:20 on the morning of June 3, when Plaintiff had already been placed in the administrative segregation cell and before she was placed in the restraint chair, where he noted that Plaintiff appeared to be awake. (Id. at ¶ 7.) At 11:50 a.m., he offered her lunch, which she refused.  (Id. at ¶ 8.)  He had no further dealings or interaction with Plaintiff on June 3.  (Id.)  His next encounter did not occur until 6:00 the next morning, on June 4, when he noted that she "appear[ed] to be asleep" in the administrative segregation inspection records.  (Id. at ¶ 9.)  Plaintiff does not allege that she was in the restraint chair at that time.  Later that morning, approximately two hours before she was released, Defendant Jasso had two last encounters with Plaintiff where he noted that she appeared to be asleep and offered Plaintiff breakfast, which she refused.  (Id.)  Jasso's only involvement with Plaintiff was to monitor her during her placement in the administrative segregation/isolation unit and offer her food.  (Id.)  Because none of Plaintiff's allegations of wrongdoing relate to Defendant Jasso, he is dismissed from this case.

2.  *Defendant Sheriff Van T. Peavy*

Liberally construing her Complaint, Plaintiff asserts the following claims against Sheriff Peavy: (1) § 1983 claims for (a) excessive force, (b) inadequate conditions of

confinement, (c) deprivation of serious medical needs; and (d) failure to train and supervise jail officials; (2) state law tort claims for false imprisonment, battery, and intentional infliction of emotional distress; and (3) claims under the ADA. Sheriff Peavy contends that Plaintiff's § 1983 claims are barred by qualified immunity; Plaintiff's state law tort claims are barred by official immunity; and Plaintiff's ADA claims fail as a matter of law. Because Plaintiff has suffered no constitutional deprivations, her § 1983 claims fail. Furthermore, as explained in more detail below, her ADA and state law claims also fail.

### a.  *§ 1983 Claims*

Plaintiff brings her § 1983 claims against Sheriff Peavy in his individual capacity only, asserting that Sheriff Peavy violated her rights under the Fourteenth Amendment to the United States Constitution during her detention at the Jail. (Compl. ¶¶ 7, 62, 63, 69, 70, 71.) To make a case under § 1983, Plaintiff must prove that Sheriff Peavy, acting under color of state law, deprived her of a right, privilege, or immunity secured by the Constitution or federal law. See 42 U.S.C. § 1983. Because the evidence fails to establish that Plaintiff was deprived of her constitutional rights as a pretrial detainee to be free from excessive force, inadequate conditions of confinement, and inadequate medical care under the Fourteenth Amendment, her § 1983 claims fail as a matter of law.

### (i)  *Excessive Force*

To prevail on Plaintiff's excessive force claim pursuant to the Fourteenth Amendment, Plaintiff must show that the officials' conduct "shocks the conscience."

19

Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1196 (11th Cir. 2003). To meet this standard, the conduct must "offend even hardened sensibilities" and will be only the "most egregious official conduct." Carr v. Tatangelo, 338 F.3d 1259, 1271 (11th Cir. 2003). In evaluating whether a pretrial detainee's excessive force claim meets this standard, the Court looks to several factors including: (1) the need for force; (2) the amount of force used; and (3) the extent of injury inflicted. Id. Finally, "whether or not a prison guard's application of force is actionable turns on whether that force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005).

The Court finds no deprivation of Plaintiff's constitutional rights. Plaintiff does not dispute that she was placed in the restraint chair because she continued to strike the cell with her hands and feet and demonstrated a risk of self harm. Jail officials, believing that Plaintiff's actions may cause her self-harm, followed policy by placing her in the restraint chair. The policy authorizes use of the restraint chair to "restrain and limit the involvement of inmates/detainees who exhibit such violent behavior that they become a danger to themselves or others." (Van Peavy Aff., Ex. C.) Thus, the need for force to protect Plaintiff from self harm was legitimate.

Moreover, the amount of force used was legitimate. Although Plaintiff contends that she was placed in the chair for a continuous period of ten hours with no breaks, Plaintiff presents no admissible evidence to support her claims, and thus, has presented no genuine issue of material fact. The Court simply has before it the unsworn

statements made by Plaintiff in her Complaint and in her Response. Plaintiff has filed no affidavit or any other sworn statement to verify her claims. "[U]nsworn statements, even from pro se parties, should not be considered in determining the propriety of summary judgment." Gordon v. Watson, 622 F.2d 120, 123 (5th Cir. 1980) (citation and internal quotation marks omitted). "Federal law does provide an alternative to making sworn statement, but requires that the statement include a handwritten averment, signed and dated, that the statement is true under the penalties of perjury. Id. (citing 28 U.S.C. § 1746). However, Plaintiff's statements do not include the proper averment. Plaintiff may not rest on her pleadings to establish the existence of a genuine issue of material fact. See Fed. R. Civ. P. 56(e). Two separate prison logs, kept in the normal course of business, show that Plaintiff was placed in the chair for a total of five hours and fifteen minutes and offered breaks which she refused . Plaintiff was released once for fifteen minutes, but after telling officials that she would continue beating on her cell, which she, in fact, did with her hands and feet, officials re-placed her in the chair for her protection from self-harm. Plaintiff was offered release a second time, and offered a bathroom break and food and drink – all of which Plaintiff refused, telling officials she would continue to beat on her cell if she was released.

Furthermore, there is no evidence Plaintiff suffered any injuries as a result of her placement in the chair. The record reflects no evidence that jail officials placed Plaintiff in the restraint chair maliciously or sadistically for the purpose of causing Plaintiff harm. All evidence shows that Plaintiff's placement in the restraint chair was applied in a good faith effort to prevent Plaintiff from inflicting self-harm.

(ii)     *Conditions of Confinement*

Plaintiff alleges in her Complaint that jail officials failed to keep her safe and exposed her to a risk of harm. (Compl. ¶ 72.)  The Court construes her allegation as one challenging that her placement in the restraint chair constituted an unconstitutional condition of confinement in violation of the Fourteenth Amendment.

Absent a "formal adjudication of guilt in accordance with due process of law," a state does not have the authority to impose punishment.  Ingraham v. Wright, 430 U.S. 651, 671-71 n.40 (1977).  Therefore, "[c]onditions of confinement imposed prior to conviction are limited . . . by the due process clause of the [F]ourteenth [A]mendment," instead of the Eighth Amendment.  Hamm, 774 F.2d at 1572 (citing Bell v. Wolfish, 441 U.S. 520, 535-37 n. 16 (1979)).  However, in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the [E]ighth [A]mendment for convicted persons."  Hamm, 774 F.2d at 1574.  In evaluating a pretrial detainee's conditions of confinement, "a court must decide whether the detention officials intentionally imposed the restriction for a punitive purpose or whether it is reasonably incidental to a legitimate government objective."  Wilson v. Blankenship, 163 F.2d 1284, 1291-92 (11th Cir. 1998).  "If a restriction is not reasonably related to a legitimate purpose . . . a court may infer that the purpose of the government action is punishment."  Lynch v. Baxley, 744 F.2d 1452, 1463 (11th Cir. 1984).  A court must also be mindful that "not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense. . . .  And the fact that such detention interferes

22

with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restriction of detention into 'punishment.'" <u>Bell</u>, 441 U.S. at 537.

Again, the Court finds that no constitutional violation occurred as a result of Plaintiff's restraint. The Court can find no evidence that any jail official intentionally restrained Plaintiff for the purpose of punishing her. Instead, the facts show that Plaintiff was placed in the restraint chair to prevent her from harming herself, which is a legitimate, non-punitive government objective. <u>See</u> <u>Perdue v. Union City, Ga.</u>, 2006 WL 25223094, *12-13 (N.D. Ga. Aug. 28, 2006).

(iii)    *Deliberate Indifference to Serious Medical Needs*

In the context of a pretrial detainee's claim for "deliberate indifference to medical needs," the Eleventh Circuit has treated the Eighth and Fourteenth Amendment protections as co-extensive. <u>Hamm</u>, 774 F.2d at 1574. Thus, Plaintiff must allege facts demonstrating that prison staff acted with deliberate indifference to her serious medical conditions and needs. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976); <u>Taylor v. Adams</u>, 221 F.3d 1254 (11th Cir. 2000); <u>Aldridge v. Montgomery</u>, 753 F.2d 970, 072 (11th Cir. 1985).

To show that a prison official acted with deliberate indifference to serious medical needs, "a plaintiff must satisfy both an objective and a subjective inquiry. First, a plaintiff must set forth evidence of an objectively serious medical need. Second, a plaintiff must prove that the prison official acted with an attitude of 'deliberate indifference' to that serious medical need." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th

Cir. 2003).  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Id. at 1243 (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)).  In either case, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm."  Id. (citation and internal quotation marks omitted).

Even assuming Plaintiff's purported conditions qualify as a serious medical need, Plaintiff's claim fails because she cannot establish the second element of her claim.  To establish the second element – deliberate indifference to the serious medical needs – the prisoner must prove three facts: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence."  Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).  Deliberate indifference may be established by a showing of "grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment."  Id. (citations and internal quotation marks omitted).  Moreover, "when the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."  Id. (citations and internal quotation marks omitted).

Based on this standard, the Court finds no support for Plaintiff's allegations.  The morning after Plaintiff arrived at the Jail and informed prison officials of her medical conditions, she was taken to the medical unit for evaluation.  Despite Plaintiff's contentions that she was not medically evaluated, the admissible evidence shows otherwise.  Plaintiff was incarcerated for a total of thirty-six hours.  During that thirty-

six hours, prison records establish that Plaintiff was medically evaluated and screened for risk of suicide. Plaintiff even admits that Nurse Watson asked Plaintiff for her medications, but Plaintiff refused to answer. Plaintiff certainly fails to meet the high standard to establish a constitutional deprivation based on deliberate indifference to her serious medical needs.

### (iv) *Restraint Chair Policy/Failure to Train*

Having found Plaintiff suffered no constitutional deprivations, the Court need not inquire into Plaintiff's claims regarding the Restraint Chair Policy and Sheriff Peavy's failure to train and supervise jail officials. "An inquiry into a government entity's custom or policy is relevant only when a constitutional deprivation has occurred." Rooney v. Watson, 101 F.3d 1378, 1381-82 (11th Cir. 1996). Furthermore, a failure to train claim cannot exist independent of a constitutional violation. Id. at 1381 n.2 ("[Plaintiffs] also allege that [the county's] failure to train officers for high speed vehicle operation leads to a cognizable cause of action under section 1983. [Plaintiffs] cannot maintain this cause of action, however, because the automobile accident did not rise to a level of violating their constitutional rights."); see also Vaughn v. City of Athens, 176 Fed. Appx. 974, 978 (11th Cir. 2006) (finding that because there was no constitutional deprivation, police chief could not be held liable under § 1983 based on a policy or failure to train jail staff) (citing Rooney, supra). Thus, these claims also fail.


### (v) *Qualified Immunity*

Plaintiff's claims are also barred by Sheriff's Peavy's qualified immunity.

"Qualified immunity protects government officials performing discretionary functions from civil trial (and other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lassiter v. Alabama A&M Univ., 28 F.3d 1146 (11th Cir. 1994) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800 (1991)). The qualified immunity inquiry involves a three-step process. Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002). First, the burden is on the defendant to prove that he was acting within the scope of his discretionary authority. Id. If the defendant meets this burden, then the Court must determine whether plaintiff's allegations, if true, establish a constitutional violation. Id. Finally, if the facts alleged would prove the violation of a constitutional right, the inquiry is whether the law with respect to that right was clearly established. Id.

Here, the first inquiry of the qualified immunity analysis is unquestionably met: Sheriff Peavy was acting within the scope of his discretionary function as sheriff with respect to the actions at issue in this case. As explained in detail above, the Court has also found Plaintiff's allegations do not establish a constitutional violation. Having found the evidence in this case would not support a reasonable jury's finding that Plaintiff's constitutional rights were violated, the Court need not address whether Sheriff Peavy's alleged conduct was a violation of clearly established law. Campbell v. Sikes, 169 F.3d 1353, 1361-62 (11th Cir. 1999) (citing Killian v. Holt, 166 F.3d 1156 (11th Cir. 1999)). Therefore, the Court finds Sheriff Peavy is entitled to qualified immunity on Plaintiff's § 1983 claims.

b. *State Tort Law Claims*

Plaintiff also asserts tort claims under Georgia law for false imprisonment, battery, and intentional infliction of emotional distress against Sheriff Peavy in his individual capacity.[5] Nowhere in her Complaint does Plaintiff allege that Sheriff Peavy was personally involved in any incident involving Plaintiff during her incarceration. Thus, any claims are necessarily predicated either upon a theory of vicarious liability or upon a claim that jail policies or failure to train or supervise caused injury. Plaintiff's state law claims, however, are barred by the doctrine of official immunity.

Under Georgia law, the doctrine of official immunity, also known as qualified immunity, affords public officers and employees limited protection from suit in their personal capacities. Harvey v. Nichols, 260 Ga. App. 187, 190 (Ga. Ct. App. 2003) (citation omitted). "Qualified immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption." Id. (citation omitted). Public officials are "subject to suit only when they negligently perform or fail to perform their 'ministerial function' or when they act with actual malice or intent to cause injury in the performance of their 'official functions.'" Gilbert v. Richardson, 264 Ga. 744, 753

_____

[5] Plaintiff does not purport to bring state law claims against Sheriff Peavy in his official capacity. However, even if her Complaint could be construed as such, Sheriff Peavy would be protected from suit by the doctrine of sovereign immunity. Under the Georgia Constitution, sovereign immunity is extended to "the state and all of its departments and agencies." Grech, 335 F.3d at 1340-41(citing Ga. Const. Art. I, § 2, ¶ 9(e)). "Georgia courts have interpreted this provision to grant sovereign immunity to sheriffs." Id. (citing Cantrell v. Thurman, 231 Ga. App. 510, 514-15 (Ga. Ct. App. 1998)).

(1994). Whether a duty is ministerial or discretionary turns on the character of the specific act. Reed v. Dekalb County, 264 Ga. App. 83, 86 (Ga. Ct. App. 2003) (citation omitted). "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." Harvey, 260 Ga. App. at 191. A discretionary act, on the other hand, "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Id. (citation omitted).

In this case, enactment of jail policies and the training and supervision of employees are clearly discretionary acts. See Id. at 190-91(sheriff's duties of operating jail, supervising jail's officers and employees, and establishing procedures and policies for jail were discretionary acts, and thus sheriff was entitled to official immunity in wrongful death action brought by parents of jail inmate who hanged himself in jail cell). Therefore, Sheriff Peavy is entitled to official immunity unless the evidence shows that he acted with "actual malice or intent to cause injury." Gilbert, 264 Ga. at 753.

"[I]n the context of official immunity, actual malice means a deliberate intention to do a wrongful act [and] [s]uch act maybe accomplished with or without ill will and whether or not injury was intended." Meagher v. Quick, 264 Ga. App. 639, 645 (Ga. Ct. App. 2003) (internal quotation and citation omitted). "Willful, wanton, and reckless conduct does not equate with the actual malice necessary to defeat a claim of official immunity." Hanse v. Phillips, 276 Ga. App. 558, 563 (Ga. Ct. App. 2005). Here, the record is devoid of any evidence to show that Sheriff Peavy acted with actual malice or

intent to cause injury. Thus, Sheriff Peavy is entitled to official immunity on Plaintiff's state law claims.

c. *ADA Claims*

Plaintiff also asserts claims for monetary damages against Sheriff Peavy, in his official capacity, for violation of her rights under the Americans with Disabilities Act, 42 U.S.C. § § 12131 et seq. In an official-capacity suit, the real party in interest is the government entity whom the official represent. See, e.g., Miller v. King, 384 F.3d 1248, 1264 n.16 (11th Cir. 2004) (citation omitted). As explained above, the conduct alleged to give rise to Plaintiff's ADA claim – failure to provide medical treatment and accommodations – concern state, not county, functions. In carrying out these functions, the sheriff acts as an official of the State. See Manders, 338 F.3d at 1315. Thus, Plaintiff's ADA claim against Sheriff Peavy in his official capacity is in effect against the State – the proper "public entity" which bears responsibility for the conduct alleged to have violated the ADA. See 42 U.S.C. § 1213(1). Even assuming the Eleventh Amendment does not bar Plaintiff's ADA claims for monetary damages,[6] Plaintiff is still unable to establish a violation of the ADA.

To prove a claim under Title II of the ADA, a plaintiff must establish: (1) that she is a qualified individual with a disability; (2) that she was excluded from the participation in or denied the benefits of the services, programs, or activities of a public

---

[6] See United States v. Georgia, 546 U.S. 151 (2006) (holding that Title II of the ADA validly abrogates state sovereign immunity insofar as it creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment).

entity or otherwise subjected to discrimination by such entity; (3) by reason of such disability. <u>Shotz v. Cates</u>, 256 F.3d 1077, 1079 (11th Cir. 2001) (citing 42 U.S.C. § 12131). Assuming Plaintiff is a "qualified individual" under the ADA, Plaintiff nevertheless fails the second and third prongs of the test. The record fails to establish that Plaintiff was denied the benefits of any services, programs, or activities of the Jail or otherwise subjected to discrimination by the Jail by reason of her disabilities.

The record shows, and the Plaintiff acknowledges in her Complaint, that during her thirty-six hours of incarceration, she was seen and evaluated by a nurse. Medical records document that early during the first morning of her incarceration, at 9:00 a.m., on June 3, 2004, Plaintiff was taken to registered nurse Pat Watson for evaluation. (Second Aff. of Melanie Watson, Ex. A.) Plaintiff was evaluated for her medications and for the "gathering of medical history information." (<u>Id.</u>) The records further document that officials completed an "Inmate Health Questionnaire" which describes the medications Plaintiff reported that she was taking for her medical conditions, and treatments she was undergoing. (<u>Id.</u>) Nurse Watson also completed a medical form entitled "Problem List." The records show that an "Inmate checklist" was completed, including "Screening Orientation of Medical Services," and obtaining a "General Consent for Treatment." (<u>Id.</u>) In addition, the records contain a completed "Suicide Prevention Screening Form." Plaintiff was only incarcerated for three days and fails to establish that she did not receive any benefits or services available to a pretrial detainee incarcerated for such a brief time period. Furthermore, the record contains no evidence showing that the alleged discrimination "occurred by reason of such disability." Thus,

Plaintiff's ADA claims fail as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Defendants' Motions for Summary Judgment [Docs 14, 19, and 29]; **DENIES as moot** Defendants' Motion to Strike [Doc 36] and Motion to Quash Subpoena [Doc 49]; and **DENIES** Plaintiff's Motion to Reopen the Discovery Period and to Extend Time in which to Conduct Discovery and to Prepare and Respond to Dispositive Motions [Doc. 51].

**SO ORDERED** this 28th day of September, 2007.

S/ C. Ashley Royal
C. ASHLEY ROYAL
United States District Judge

SSH/scs